**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| NORTHSTAR FINANCIAL ADVISORS INC., on behalf of itself and all others similarly situated, *Plaintiff-Appellant*, v. SCHWAB INVESTMENTS; MARIANN BYERWALTER, DONALD F. DORWARD, WILLIAM A. HASLER, ROBERT G. HOLMES, GERALD B. SMITH, DONALD R. STEPHENS, MICHAEL W. WILSEY, CHARLES R. SCHWAB, RANDALL W. MERK, JOSEPH H. WENDER and JOHN F. COGAN, as Trustees of Schwab Investments; and Charles Schwab Investment Management, Inc., *Defendants-Appellees*. | No. 11-17187 D.C. No. 5:08-cv-4119-LHK OPINION |

Appeal from the United States District Court
for the Northern District of California
Lucy H. Koh, District Judge, Presiding

Argued and Submitted
May 17, 2013—San Francisco, California

Filed March 9, 2015

2    NORTHSTAR FIN. ADVISORS V. SCHWAB INV.

Before:  Richard R. Clifton and Carlos T. Bea, Circuit Judges, and Edward R. Korman, Senior District Judge.[*]

Opinion by Judge Korman;
Dissent by Judge Bea

---

## SUMMARY[**]

---

### Mutual Funds

The panel reversed in part and vacated in part the district court's dismissal of a shareholder class action on behalf of investors who alleged that the managers of the Schwab Total Bond Market Fund, a mutual fund, failed to adhere to the Fund's fundamental investment objectives of seeking to track a particular index and not over-concentrating its investments in any one industry.  The Fund was created by Schwab Investments ("Schwab Trust"), a "Massachusetts trust," and its investment adviser was Charles Schwab Investment Management, Inc. ("Schwab Advisor").

The named plaintiff was Northstar Financial Advisors, Inc., a registered investment advisory and financial planning firm that managed accounts on behalf of investors and had over 200,000 shares of the Fund under its management.  The

---

[*] The Honorable Edward R. Korman, Senior District Judge for the United States District Court for the Eastern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

panel held that Northstar had standing because it filed a supplemental pleading under Federal Rule of Civil Procedure 15(d) after obtaining an assignment of claim from an investor in the Fund.

The panel reversed the district court's dismissal of breach of contract claims. It held that the Fund shareholders' adoption of the investment objectives added a structural restriction on the power conferred on the Fund trustees that could only be changed by a vote of the shareholders, and was subsequently reflected in the Fund's registration statements and prospectuses, and thus created a contract between the trustees and Fund investors.

Vacating the dismissal of fiduciary duty claims, the panel held that the operative complaint stated a claim that the Schwab defendants breached their fiduciary duties by failing to ensure that the Fund was managed in accordance with the fundamental investment objectives and by changing the Fund's fundamental investment objectives without obtaining required shareholder authorization. The panel held that the trustees owed a fiduciary duty to the shareholders, rather than the Fund, and so Northstar was not required to proceed by way of a derivative action.

The panel reversed the dismissal of a third-party beneficiary breach of contract claim. It held that Northstar adequately alleged that the investors were third-party beneficiaries of the Investment Advisory and Administration Agreement between Schwab Trust and Schwab Advisor.

The panel declined to address the effect of the Securities Litigation Uniform Standards Act on the various common law causes of action. It remanded the case to the district court.

Dissenting, Judge Bea wrote that Northstar lacked standing because, at the commencement of the action, it did not own any fund shares, nor did it own any claims of others who had suffered losses the defendants had allegedly caused.

---

**COUNSEL**

Robert C. Finkel (argued), Wolf Popper LLP, New York, New York; Joseph J. Tabacco, Jr., Christopher T. Heffelinger, and Anthony D. Phillips, Berman DeValerio, San Francisco, California; Marc J. Gross, Greenbaum Rowe Smith & Davis LLP, Roseland, New Jersey, for Plaintiff-Appellant.

Karin Kramer and Arthur M. Roberts, Quinn Emanuel Urquhart & Sullivan, LLP, San Francisco, California; Richard Schirtzer (argued), Susan R. Estrich, and B. Dylan Proctor, Quinn Emanuel Urquhart & Sullivan, LLP, Los Angeles, California, for Defendants-Appellees.

---

## OPINION

KORMAN, District Judge:

The Investment Company Act ("ICA") establishes a comprehensive federal regulatory framework applicable to mutual funds. *See* 15 U.S.C. § 80a-1 *et seq*. More specifically, it provides that a mutual fund's registration statement must recite all investment policies that can be changed only by shareholder vote. 15 U.S.C. § 80a-8(b). Deviation from policies so designated violates § 13(a) of the ICA. 15 U.S.C. § 80a-13(a)(3). This appeal arises out of a class action on behalf of investors who allege that the managers of the Schwab Total Bond Market Fund ("Fund") failed to adhere to two of the Fund's fundamental investment objectives; namely, that it seek to track a particular index and that it not over-concentrate its investments in any one industry. These objectives, which could only be changed by a vote of the shareholders, were adopted by a shareholder vote and subsequently incorporated in the Fund's registration statement and prospectuses.

On a previous interlocutory appeal, we rejected the argument that this conduct gave rise to an implied private right to enforce § 13(a) of the ICA. *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 615 F.3d 1106 (9th Cir. 2010). On this appeal from an order granting a motion to dismiss a Third Amended Complaint, the principal issues are whether the investors have stated valid causes of action for breach of contract, breach of fiduciary duty, and breach of an agreement to which the investors claim to be third-party beneficiaries.

6      NORTHSTAR FIN. ADVISORS V. SCHWAB INV.

## BACKGROUND

Schwab Investments ("Schwab Trust") is an investment trust organized under Massachusetts law. Such a trust, which is often referred to generically as a "Massachusetts trust," even when not created under Massachusetts law, is an unincorporated business organization created by an instrument of trust by which property is to be held and managed by trustees for the benefit of persons who are or become the holders of the beneficial interests in the trust estate. *See Hecht v. Malley*, 265 U.S. 144, 146–47 (1924).[1] Thus, the Schwab Trust's Agreement and Declaration of Trust states that "the Trustees hereby declare that they will hold all cash, securities and other assets, which they may from time to time acquire in any manner as Trustees hereunder IN TRUST to manage and dispose of the same . . . for the pro rata benefit of the holders from time to time of Shares in this Trust." Schwab Investments, Registration Statement (Form N-1A), Agreement and Declaration of Trust 1 (Ex. 1) (Dec. 29, 1997) [hereinafter "Agreement and Declaration of Trust"]. Such a "trust today is a preferred form of organization for mutual funds and asset securitization." Dukeminier, Sitkoff & Lindgren, *Wills, Trusts, and Estates* 556.

---

[1] "Unlike the corporation of the late 1800s and early 1900s, the common law business trust was only lightly regulated, so entrepreneurs used the business trust to escape the comparatively much heavier regulation of the corporate form. Using the business trust for this purpose was so pronounced in Massachusetts, where corporate ownership of real estate was prohibited, that the term *Massachusetts trust* became synonymous with business trust." Jesse Dukeminier, Robert H. Sitkoff & James Lindgren, *Wills, Trusts, and Estates* 555–56 (8th ed. 2009).

One of the significant features that distinguishes a Massachusetts trust from the ordinary or private trust "lies in the manner in which the trust relationship is created; investors in a business trust enter into a voluntary, consensual, and contractual relationship, whereas the beneficiaries of a traditional private trust take their interests by gift from the donor or settlor." Herbert B. Chermside, Jr., *Modern Status of the Massachusetts or Business Trust*, 88 A.L.R.3d 704, 720 (1978); *see also Berry v. McCourt*, 204 N.E.2d 235, 240 (Ohio Ct. App. 1965) ("By an underlying contract, or in the provisions of a business trust instrument, or both, the parties *agree* on the operations of the venture."). Thus, the Agreement and Declaration of Trust at issue here states at the very outset that it was made "by the Trustees hereunder, and by the holders of shares of beneficial interest to be issued hereunder." Agreement and Declaration of Trust 1. Moreover, it continues that "[e]very Shareholder by virtue of having become a Shareholder shall be held to have expressly assented and agreed to the terms hereof and to have become a party hereto." Agreement and Declaration of Trust 4.

Because this case involves the relationship between investors and a mutual fund, the trust which created the fund and the investment adviser which manages the fund, it is helpful to have a clear understanding of the relationships among these parties. We begin with a useful, if oversimplified, description of a mutual fund:

> *T*, an investment professional, approaches *A*, *B*, *C*, and others like them and agrees to pool certain of their assets in a common fund to be managed by *T*. *A*, *B*, *C*, and the other investors each receive tradable shares in the fund in an amount proportional to their

> investment. By structuring their collective investment in this way, *A*, *B*, *C*, and the others are able to take advantage of economies of scale, obtain professional portfolio management, and achieve a more diversified portfolio than each could have individually. In managing the portfolio, *T* is subject to a fiduciary obligation to *A*, *B*, *C*, and the other investors in the fund.

Dukeminier, Sitkoff & Lindgren, *Wills, Trusts, and Estates* 556.

This simple description does not adequately discuss perhaps the most important party to this arrangement, namely, the investment adviser, whose "main role is to supervise and manage the fund's assets, including handling the fund's portfolio transactions." Clifford E. Kirsch, *An Introduction to Mutual Funds*, in *Mutual Fund Regulation* § 1:2.2 (Clifford E. Kirsch ed., 2d ed. 2005). The investment adviser is not a mere employee, contractor, or consultant. Instead, it is "more often than not also the creator, sponsor, and promoter of the mutual fund." Charles E. Rounds, Jr. & Charles E. Rounds, III, *Loring and Rounds: A Trustee's Handbook* 955–56 (2012 ed.); *see also Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 93 (1991) (Mutual funds "typically are organized and underwritten by the same firm that serves as the company's 'investment adviser.'"); *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536 (1984) (Mutual funds are "typically created and managed by a pre-existing external organization known as an investment adviser." (citing *Burks v. Lasker*, 441 U.S. 471, 481 (1979))).

Thus, while "[i]n theory, the [trust] is able to choose any adviser it deems appropriate to invest the fund's portfolio, based on the adviser's investing style, track record and fees," in practice, the investment adviser picked to manage the portfolio is most often self-selected and unlikely to be removed. John Shipman, *So Who Owns Your Mutual Fund?*, Wall St. J., May 5, 2003, at R1, *available at* http://online.wsj.com/news/articles/SB105207969873142900. Because "a typical fund is organized by its investment adviser which provides it with almost all management services . . . , a mutual fund cannot, as a practical matter sever its relationship with the adviser." *Burks*, 441 U.S. at 481 (quoting S. Rep. No. 91-184, at 5 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4901).

Consistent with this description of the structure of a mutual fund and its relationship with its investment adviser, the Schwab Trust selected Charles Schwab Investment Management, Inc. ("Schwab Advisor") as its investment adviser. Indeed, Charles R. Schwab is alleged to have been chairman and trustee of the Schwab Trust and a member of the board of the Schwab Advisor. Third Am. Compl. ¶ 38. The latter is a subsidiary of the Charles Schwab Corporation, of which Mr. Schwab has served as "CEO at various times, including from 2004 through October 2008." Third Am. Compl. ¶ 36. Moreover, the complaint alleges that all "[d]efendants and their affiliates held themselves out as one Schwab entity[.]" Third Am. Compl. ¶ 167.

The mutual fund at issue here, one of several operated by the Schwab Trust, is the Schwab Total Bond Market Fund. Reflecting the terms of a proxy statement proposed by the Schwab Trust in 1997, and subsequently adopted by the shareholders by majority vote, the prospectuses that the Fund

issued during the relevant period stated that the Fund was "designed to offer high current income by tracking the performance of the Lehman Brothers [U.S.] Aggregate Bond Index [("Lehman Index")]" and was "intended for investors seeking to fill the fixed income component of their asset allocation plan." Specifically, the Lehman Index included "investment-grade government, corporate, mortgage-, commercial mortgage- and asset-backed bonds that [were] denominated in U.S. dollars and ha[d] maturities longer than one year." *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 609 F. Supp. 2d 938, 945 (N.D. Cal. 2009).[2] Nevertheless, the Fund is not itself an index fund and, according to the Fund's prospectus, it was "not required to invest any percentage of its assets in the securities represented in the [Lehman] Index." Decl. of Kevin Calia in Support of Motion to Dismiss Second Amended Class Action Complaint, Ex. A at 14, Nov. 10, 2010.

The Fund disclosed in its registration statement, and reiterated in prospectuses issued thereafter, that its policy of tracking the Lehman Index was "fundamental," which means that it "cannot be changed without approval of the holders of a majority of the outstanding voting securities (as defined in the [ICA])." Schwab Investments, Registration Statement 5, 14 (Form N-1A) (Jan. 16, 1998), Prospectus 10 (Form N-1A, Part A) (Nov. 1, 1997, as amended Jan. 15, 1998); *see also*

---

[2] The former Lehman Index is now known as the Barclays U.S. Aggregate Bond Index. It currently "comprises a total of 8,286 bonds and is worth nearly $17 trillion." Carolyn Cui, *Barclays Agg Had Modest Origin*, Wall St. J., Apr. 2, 2013, http://online.wsj.com/article/SB10001424127887324883604578398880679949670.html. "[A]bout $663 billion of institutional assets is invested in 270 U.S. core fixed-income portfolios, 75% of which are benchmarked against the Barclays Agg Index." *Id.*

Michael Glazer, *Prospectus Disclosure and Delivery Requirements, in Mutual Fund Regulation* § 4:3.6 (Clifford E. Kirsch ed., 2d ed. 2005).  The Fund was also precluded from investing twenty-five percent or more of the Fund's total assets in any one industry, unless necessary to track the Lehman Index.  Schwab Investments, Registration Statement 41 (Form N-1A) (Jan. 16, 1998), Statement of Additional Information 11 (Form N-1A, Part B) (Nov. 1, 1997, as amended Jan. 15, 1998).

Northstar Financial Advisors, Inc. ("Northstar") is a registered investment advisery and financial planning firm that manages discretionary and non-discretionary accounts on behalf of investors and had over 200,000 shares of the Fund under its management.  In August 2008, Northstar filed this shareholder class action against the defendants, alleging that they deviated from the Fund's fundamental investment policies and exposed the Fund and its shareholders to tens of millions of dollars in losses.

Northstar has identified two classes of potential plaintiffs: (1) a "Pre-Breach" class, consisting of those who purchased shares of the Fund on or prior to August 31, 2007, and who continued to hold their shares as of August 31, 2007, and (2) a "Breach" class, consisting of those who purchased shares of the Fund during the period September 1, 2007 through February 27, 2009.  Northstar alleges that August 31, 2007 was the last day of the fiscal year preceding the one during which the Fund first began deviating from its required fundamental investment policies, and that on February 27, 2009, the Fund reverted back to the required policies.

This case has a lengthy and complicated procedural history that includes the dismissal of successive amended

complaints for failure to state a cognizable cause of action. Specifically, the Third Amended Complaint, which is based on the Fund's unauthorized deviation from its fundamental investment objectives, alleges five causes of action on behalf of each of the two identified classes, for a total of ten claims: breach of fiduciary duty against the Trustees[3] (counts one and six); breach of fiduciary duty against Schwab Advisor (counts two and seven); aiding and abetting breach of fiduciary duty against the Trustees (counts three and eight); aiding and abetting breach of fiduciary duty against Schwab Advisor (counts four and nine); breach of the Investment Advisory and Administration Agreement ("IAA") between Schwab Trust and Schwab Advisor.  The last cause of action is based on the allegations that the investors are third-party beneficiaries of the IAA.  The Third Amended Complaint also incorporates by reference a breach of contract cause of action against the Schwab Trust that was alleged in the Second Amended Complaint, but dismissed with prejudice on an earlier motion to dismiss.  The incorporation by reference was included to preserve Northstar's right to appeal from the dismissal of this cause of action with prejudice.

## STANDARD OF REVIEW

We review de novo the district judge's order granting a motion to dismiss.  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1030 (9th Cir. 2008).  On a motion to dismiss, "[w]e accept factual allegations in the complaint as

---

[3] "Trustees" is a collective reference to the trustees of Schwab Trust: defendants Mariann Byerwalter, Donald F. Dorward, William A. Hasler, Robert G. Holmes, Gerald B. Smith, Donald R. Stephens, Michael W. Wilsey, Charles R. Schwab, Randall W. Merk, Joseph H. Wender, and John F. Cogan.

true and construe the pleadings in the light most favorable to the non-moving party." *Id*. at 1031. "[W]e may consider materials incorporated into the complaint or matters of public record." *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010). We may also consider "documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.'" *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (alteration in original) (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999)); *see also Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 511 (9th Cir. 2013). This is sometimes referred to as the "incorporation by reference" doctrine. *Knievel*, 393 F.3d at 1076; *see also Lapidus v. Hecht*, 232 F.3d 679, 682 (9th Cir. 2000).

Among the documents we consider pursuant to that doctrine are three sets of the Schwab Trust's filings with the Securities and Exchange Commission: (1) the Registration Statement of December 29, 1997; (2) the Registration Statement of January 16, 1998, which was filed with the Prospectus and Statement of Additional Information of November 1, 1997, as amended January 15, 1998; and (3) the Prospectus and Statement of Additional Information of November 15, 2004. While all of these documents are referred to in the complaint, the entire content of each document does not appear to be part of the record. Nevertheless, "[i]t is appropriate to take judicial notice of this information, as it was made publicly available by [the SEC], and neither party disputes the authenticity of the [documents] or the accuracy of the information displayed therein." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) (citing Fed. R. Evid. 201); *see also Dreiling v. Am. Express Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006) (We "may

consider documents referred to in the complaint or any matter subject to judicial notice, such as SEC filings."). Indeed, defendants, who might otherwise be aggrieved by their use, created and filed them with the SEC. Under these circumstances, it is appropriate for us to consider them here. *See* 1 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 2:8 at 359–61 (4th ed. 2013).

## DISCUSSION

### I.  *Standing*

We pause before addressing the merits to discuss the issue of whether Northstar has standing. Northstar filed its initial class action complaint on behalf of investors in the Fund on August 28, 2008. Northstar owned no shares of the Fund, but it brought the action in its own name, without obtaining an assignment of claims from an investor in the Fund. Subsequently, in a comparable case brought by an asset management firm, the Second Circuit held that "the minimum requirement for injury-in-fact is that the plaintiff have legal title to, or a proprietary interest in, the claim." *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 108 (2d Cir. 2008). On December 8, 2008, after *W.R. Huff* was decided, Northstar obtained an assignment of claim from a client-shareholder.

Defendants argue that because standing must be determined at the time a complaint is filed, and because Northstar did not obtain an assignment of claim until several months after the original complaint was filed, the assignment could not cure Northstar's original lack of standing. The district judge (Susan Illston, *J*.), to whom the case was then assigned, dismissed Northstar's complaint for lack of

standing with a suggestion that this defect could be cured by filing an amended complaint. *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 609 F. Supp. 2d 938, 942 (N.D. Cal. 2009). Northstar followed her suggestion. After Schwab renewed its motion to dismiss the amended complaint, the district court judge to whom the case had been reassigned (Lucy Koh, *J.*) declined to order the dismissal of the complaint because to do so would have "elevate[d] form over substance" and thus she treated the prior order as granting plaintiff leave to file a supplemental pleading under Rule 15(d) instead of an amended complaint pursuant to Rule 15(a). *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 781 F. Supp. 2d 926, 932–33 (N.D. Cal. 2011). In so doing, she observed that, "[a]lthough there is no published Ninth Circuit authority on this point, courts in other circuits have found that parties may cure standing deficiencies through supplemental pleadings." *Id.* at 933 (citing, *inter alia*, *Travelers Ins. Co. v. 633 Third Assoc.*, 973 F.2d 82, 87–88 (2d Cir. 1992)). We review this ruling *de novo*, *Renee v. Duncan*, 686 F.3d 1002, 1010 (9th Cir. 2012), and we agree with Judge Koh's application of Fed. R. Civ. P. 15(d).

Rule 15(d) permits a supplemental pleading to correct a defective complaint and circumvents "the needless formality and expense of instituting a new action when events occurring after the original filing indicated a right to relief." Wright, Miller, & Kane, Federal Practice and Procedure: Civil 3d § 1505, pgs. 262–63. Moreover, "[e]ven though [Rule 15(d)] is phrased in terms of correcting a deficient statement of 'claim' or a 'defense,' a lack of subject-matter jurisdiction should be treated like any other defect for purposes of defining the proper scope of supplemental pleading." *Id.* at § 1507, pg. 273. Indeed, in *Matthews v. Diaz*, 426 U.S. 67 (1976), the Supreme Court addressed the

issue in a case in which an applicant for Medicare had failed to file his application until after an amended complaint had been filed joining him as an additional complainant in an as-yet uncertified class action.  In holding that this jurisdictional defect could be cured by a supplemental pleading, the Supreme Court observed:

> Although 42 U.S.C. § 405(g) establishes filing of an application as a nonwaivable condition of jurisdiction, Espinosa satisfied this condition while the case was pending in the District Court.  A supplemental complaint in the District Court would have eliminated this jurisdictional issue; since the record discloses, both by affidavit and stipulation, that the jurisdictional condition was satisfied, it is not too late, even now, to supplement the complaint to allege this fact.

*Id.* at 75 (internal citations omitted).  This holding is consistent with *Rockwell Int'l Corp. v. United States*, in which the Supreme Court subsequently held that "when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction."  549 U.S. 457, 473–74 (2007).

We add here a brief discussion of the thoughtful holding of the Court of Appeals for the Federal Circuit that summarizes the case law addressing supplemental pleadings. There, "[a]s an initial matter, the parties dispute[d] whether the allegations in [the plaintiff's] Amended Complaint that concern actions taken after the filing of the initial complaint can be used to establish subject matter jurisdiction." *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1337 (Fed. Cir.

2008).  Relying on Rule 15(d) and *Matthews v. Diaz*, the Court of Appeals treated the complaint as a supplemental complaint and held that it was sufficient to cure the original complaint's jurisdictional defect:

> Thus, while "[l]ater events may not create jurisdiction where none existed at the time of filing," the proper focus in determining jurisdiction are "the facts existing at the time the complaint *under consideration* was filed." *GAF Bldg. Materials Corp. v. Elk Corp.*, 90 F.3d 479, 483 (Fed.Cir.1996) (emphasis added) (quoting *Arrowhead Indus. Water, Inc. v. Ecolochem Inc.*, 846 F.2d 731, 734 n. 2 (Fed. Cir. 1988)); *see also Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 127 S.Ct. 1397, 1409, 167 L.Ed.2d 190 (2007) ("[W]hen a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction."); *Connectu LLC v. Zuckerberg*, 522 F.3d 82 (1st Cir. 2008).  As the district court accepted Prasco's Amended Complaint, it is the Amended Complaint that is currently under consideration, and it is the facts alleged in this complaint that form the basis for our review.

*Id*.  *See also Feldman v. Law Enforcement Assocs. Corp.*, 752 F.3d 339, 347 (4th Cir. 2014) ("[W]e construe the present complaint as a supplemental pleading under Rule 15(d), thereby curing the defect which otherwise would have deprived the district court of jurisdiction under Rule 15(c)."); *Black v. Sec'y of Health and Human Servs.*, 93 F.3d 781, 790

(Fed. Cir. 1996) ("Nonetheless, a defect in the plaintiff's case, even a jurisdiction defect, can be cured by a supplemental pleading under Rule 15(d) in appropriate circumstances."); *United Partition Sys., Inc. v. United States*, 59 Fed. Cl. 627, 644 (Fed. Cl. 2004) ("The Supreme Court has interpreted Fed. R. Civ. P. 15(d) to permit supplemental pleadings in which a plaintiff may correct a jurisdictional defect in its complaint by informing the court of post-complaint events.").

Judge Koh's holding is also consistent with the approach to the Federal Rules of Civil Procedure taken by Judge Clark, "the principal architect of the Federal Rules of Civil Procedure." *Zahn v. International Paper Co.*, 414 U.S. 291, 297 (1973). Thus, in *Hackner v. Guaranty Trust Co. of New York*, 117 F.2d 95 (2d Cir. 1941), the complaint was subject to dismissal because the plaintiffs did not allege damages sufficient to satisfy the minimum amount required to invoke subject-matter jurisdiction on the basis of diversity of citizenship. An amended complaint was then filed which added a plaintiff, Eunice Eastman, whose alleged damages were "well over the requirement." *Id*. at 98. Speaking for the Second Circuit, Judge Clark wrote that subject-matter jurisdiction was proper notwithstanding the fact that it was first established by the addition of Eastman as a plaintiff in the amended complaint:

> Since [Eastman] alleges grounds of suit in the federal court, the only question is whether or not she must begin a new suit again by herself. Defendants' claim that one cannot amend a nonexistent action is purely formal, in the light of the wide and flexible content given to the concept of action under the new

rules.  Actually she has a claim for relief, an action in that sense; as the Supreme Court has pointed out, there is no particular magic in the way it is instituted.  So long as a defendant has had service reasonably calculated to give him actual notice of the proceedings, the requirements of due process are satisfied. Hence no formidable obstacle to a continuance of the suit appears here, whether the matter is treated as one of amendment or of power of the court to add or substitute parties, Federal Rule 21, or of commencement of a new action by filing a complaint with the clerk, Rule 3.  In any event we think this action can continue with respect to Eastman without the delay and expense of a new suit, which at long last will merely bring the parties to the point where they now are.

*Id*. (quotations and citations omitted); *see also* Fed. R. Civ. P. 1 (which provides that the Rules of Civil Procedure "should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding").

Our dissenting colleague relies on *Morongo Band of Mission Indians v. California State Board of Equalization*, 858 F.2d 1376 (9th Cir. 1988), for the proposition that "where the district court does not have subject matter jurisdiction over a matter at the time of filing, subsequent events do not confer subject matter jurisdiction on the district court." Dissent at 66–67.  We find this argument inapposite because, unlike the present case, *Morongo* did not involve a supplemental pleading, much less one with allegations of events that occurred after the commencement of the action.

While *Morongo* does contain the broad statement that "subject matter jurisdiction must exist as of the time the action is commenced" and that a lack of subject-matter jurisdiction at the outset cannot be cured subsequently, it is now clear, if it was not then, that this rule is more nuanced than the inflexibility suggested by its language—both as it relates to curing jurisdictional defects through supplemental pleadings, s*ee, e.g.*, *Matthews*, 426 U.S. 67, and other circumstances in which defects in subject-matter jurisdiction were cured by the substitution, addition, or elimination of a party, *see, e.g. Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989); *Mullaney v. Anderson*, 342 U.S. 415 (1952); *California Credit Union League v. City of Anaheim*, 190 F.3d 997, 1000 (9th Cir. 1999). Nevertheless, we need not belabor this issue because, in order to decide this case, it is enough to say that the rule as stated in *Morongo* does not extend to supplemental pleadings filed pursuant to Fed. R. Civ. P. 15(d).

The same is true of *Righthaven LLC v. Hoehn*, 716 F.3d 1166 (9th Cir. 2013), which the dissent relies on for the "general principle that 'jurisdiction is based on facts that exist at the time of filing.'" Dissent at 66. Of course, a general principle, which *Righthaven* observed was subject to at least a few exceptions, is significantly different from the hard and fast rule that the language in *Morongo* suggested. Indeed, *Righthaven* acknowledged the possibility of additional exceptions and left open the question of whether "permitting standing based on a property interest acquired after filing" should be added to the list of exceptions. *Righthaven*, 716 F.3d at 1171 ("We need not decide whether the circumstances of this case call for a new exception to the general rule, however, because Righthaven lacked standing either way.").

Nor does the Supreme Court's holding in *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567 (2004), compel a contrary result.  There, diversity jurisdiction was lacking at the time the lawsuit was commenced because the plaintiff was a Texas-based limited partnership that included two Mexican citizens as members and the defendant was a Mexican corporation.  *Id.* at 569.  After a verdict was rendered in favor of the plaintiff, the district court granted the defendant's motion to dismiss for lack of jurisdiction.  *Id.*  On appeal, the plaintiff partnership argued that the Mexican partners had left the partnership in a transaction consummated the month before the trial began.  *Id.*  A sharply divided Supreme Court held that this change in the composition in the membership of the partnership was insufficient to cure the initial jurisdictional defect. Specifically, it held that the time-of-filing rule "measures all challenges to subject-matter jurisdiction premised upon diversity of citizenship against the state of facts that existed at the time of filing—whether the challenge be brought shortly after filing, after trial, or even for the first time on appeal."  *Id.* at 571.  Moreover, notwithstanding significant departures from the time-of-filing rule in diversity cases where the parties have changed after the filing of the complaint or on appeal, *see Newman-Green*, 490 U.S. at 830, it declined to depart from this rule where the post-filing change in circumstances "arose not from a change in the parties to the action, but from the change in the citizenship of a continuing party."  *Grupo Dataflux*, 541 U.S. at 575 (citing *Conolly v. Taylor*, 27 U.S. 556 (1829)).

Nevertheless, we do not regard that holding as dispositive here.  First, the present case does not involve the issue of diversity jurisdiction.  *See Connectu LLC v. Zuckerberg*, 522 F.3d 82, 92 (1st Cir. 2008) ("While the Court [in *Grupo*

*Dataflux*] relied upon the time-of-filing rule to thwart an effort to manufacture diversity jurisdiction during the pendency of an action, the decision operates exclusively in the realm of diversity jurisdiction."). More significantly, unlike *Grupo Dataflux*, the present case involves the filing of a supplemental pleading that became the operative pleading in the case on which subject-matter jurisdiction must be based.

Nor we do not see any consideration of policy that would justify a rule, for which our dissenting colleague argues, that a party such as Northstar must file a new complaint instead of a supplemental pleading because of a post-complaint assignment from a party that had standing. The dissent does not dispute, nor can it, that the assignee of a cause of action stands in the shoes of the assignor, *Hoffeld v. United States*, 186 U.S. 273, 276 (1902), and unquestionably has the same standing to file a complaint that the assignor could have filed. *Sprint Communications Co. v. APCC Services*, 554 U.S. 269, 271 (2008). Indeed, the dissent concedes that "had Northstar accepted the dismissal without prejudice and then filed a new complaint *after* it obtained an assignment of rights, it would have had standing and a personal stake in the outcome of this litigation." Dissent at 64 n.5 (emphasis in original).

A rule that would turn on the label attached to a pleading is difficult for us to accept. As the Eleventh Circuit has observed in a case in which an amended complaint contained jurisdictional allegations that were based on post-complaint events, "[e]xcept for the technical distinction between filing a new complaint and filing an amended complaint, the case would have been properly filed. . . . We therefore hold that we have jurisdiction over this appeal and we will reach the

merits." *M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486 (11th Cir. 1990).

Perhaps reflecting sensitivity to having a case turn on the technical distinction between a new complaint and a supplemental pleading, the dissent suggests a policy reason for the hypertechnical rule it advocates.  Thus, it argues that permitting a plaintiff to proceed by supplemental pleading alleging a post-complaint assignment of the claim has adverse practical effects.    Dissent at 69.    More specifically, "[u]ninjured parties, particularly those in search of class action lead plaintiff status, could sue first, then trawl for those truly and timely injured.  Today the majority green-lights those who would race to the courthouse and bend Federal Rules of Civil Procedure and Article III standing requirements to gain an edge over other claimants who are not as fleet of foot."  *Id.*

Under current law, however, the benefit that the dissent suggests goes to the winner of the race to the courthouse does not exist.  Presumably, the dissent is referring to the fact that counsel for the lead plaintiff becomes class counsel.  In 2003, however, Congress amended Fed. R. Civ. P. 23 to set out discrete standards for the appointment of class counsel.  Thus, Rule 23(g) now provides that in appointing class counsel, courts should consider:  the work counsel has done in identifying claims, counsel's experience in such matters, counsel's knowledge of the applicable law, and the resources that counsel will commit to representation.  Fed. R. Civ. P. 23(g)(1)(A); Wright, Miller, & Kane, Federal Practice and

Procedure: Civil 3d § 1802.3, pgs. 322–24.[4]  Under these circumstances, it would be an abuse of discretion to appoint an attorney as class counsel solely because he may have won the race to the courthouse.

More significantly, the present case was not one in which Northstar won a race to the courthouse and in which its attorneys were appointed lead counsel for that reason. Indeed, by the time it obtained the assignment from Henry Holz, over three months had passed since the complaint was filed.  This was more than enough time for a competing plaintiff to file a complaint.  No such complaint was filed.  In sum, whatever merit there may be to the dissent's concern, it is not present in this case and has been substantially eliminated by the 2003 amendments to the Federal Rules of Civil Procedure.  Moreover, that a supplemental pleading can only be filed with the permission of the district judge provides additional protection against the misuse of the pleading for strategic gamesmanship.

Thus, we agree that Judge Koh did not abuse her discretion in permitting Northstar to file a supplemental pleading after a post-complaint assignment from a party that clearly had standing.  *See Northstar*, 781 F. Supp. 2d at 931–33.

---

[4] Eight years before the amendment to Rule 23, although in a different way, Congress eliminated the race to the courthouse in securities class actions when it enacted the Private Litigation Securities Reform Act of 1995 (PLSRA).  15 U.S.C. § 77z-1(a)(3)(B)(iii); 15 U.S.C. § 78u-4(a)(3)(B)(iii).

## II. *Merits*

Before we review each of Northstar's claims, we give a brief overview of the case, and explain how the various claims relate to each other. We begin with the various governing documents of the Fund to which we have already made reference. The Agreement and Declaration of Trust, and its bylaws, establish the Trust and govern its internal affairs, and are governed by Massachusetts law. The Fund's prospectus is issued by the Schwab Advisor on behalf of the Fund on an annual basis. The Statement of Additional Information, or "SAI," produced at the same time as the prospectus, is made available to investors freely on demand, although it does not need to be mailed to them automatically. *See* Glazer, *Prospectus Disclosure and Delivery Requirements*, *in Mutual Fund Regulation* § 4:3.2 (citing Sec. & Exch. Comm'n, Form N-1A at 7, *available at* http://www.sec.gov/about/forms/formn-1a.pdf (last visited Aug. 29, 2014)).

In 1997, a proxy statement was submitted to and approved by the Fund's investors. It included two relevant proposals which we have already described in detail. Briefly, Proposal 2 stated that the Trust would "seek[] to track the investment results of [the Lehman Index] through the use of an indexing strategy." Proposal 3 stated that the Trust would not invest more than 25% of the Fund's total assets in any industry. These fundamental investment objectives could be changed only by shareholder vote. Subsequent registration statements and prospectuses reflected these changes.

Northstar's original complaint alleged four causes of action arising from the Fund's alleged violations of the fundamental investment policies. First, Northstar claimed a

private right of action under Section 13(a) of the Investment Company Act.  Second, Northstar alleged that all of the defendants had breached their fiduciary duties to the shareholders.  Third, Northstar claimed that all of the defendants had breached the contract between the investors and the Fund, contained in the Fund's prospectuses and its 1997 proxy statement.  Finally, Northstar claimed that all of the defendants had violated the implied covenant of good faith and fair dealing.

On an interlocutory appeal, we rejected Northstar's theory that it had a private right of action under the Investment Company Act.  *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 615 F.3d 1106 (9th Cir. 2010).  Nevertheless, the district judge had allowed Northstar to replead its state law claims, specifying under which state's law they were asserted and on which documents they relied.  *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 609 F. Supp. 2d 938, 945 (N.D. Cal. 2009).

Northstar then filed an amended complaint that left those claims at risk of dismissal under the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), 15 U.S.C. §§ 77p, 78bb, because it contained allegations that suggested that its claims were based on misrepresentations.  SLUSA bars certain state law class actions that allege "an untrue statement or omission of a material fact [or] the use[] of any manipulative or deceptive device or contrivance,"[5] 15 U.S.C.

---

[5] The misrepresentation must also be "in connection with the purchase or sale of a covered security."  There is no question that this class action is "in connection with the purchase or sale" of a covered security, and the district judge properly so concluded.  *Northstar*, 781 F. Supp. 2d at 937; *see Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 86–87 (2006).  As noted above, SLUSA does not apply if the action is

§ 77p(b), unless the governing law is the law of the state that has chartered or organized the entity issuing the securities. *Id.* § 77p(d)(1).

SLUSA operates "wherever deceptive statements or conduct form the gravamen or essence of the claim." *Freeman Invs., LP v. Pac. Life Ins. Co.*, 704 F.3d 1110, 1115 (9th Cir. 2013). The district judge ruled that the "central theme" of the Second Amended Complaint was that the "defendants made misrepresentations about how investments in the Fund would be managed." *Northstar*, 781 F. Supp. 2d at 934. In the district judge's view, the crux of Northstar's case was that the defendants' statements about how the shareholders' funds would be managed were false, or became false when the Fund deviated from the index in 2007. *Id.* at 933–36. The district judge also noted that the Second Amended Complaint contained one specific allegation that the Trust gave a false explanation for why the Fund underperformed its index in its May 2008 semi-annual report. *Id.* at 936; SAC ¶¶ 96–97. The district judge then dismissed the contract claims, with prejudice, for failure to state a claim on the ground that they were barred by SLUSA, and that they failed to allege a contract between the shareholders and the Fund. *Northstar*, 781 F. Supp. at 933–40. The district judge also rejected Northstar's breach of fiduciary duty causes of action under SLUSA, but gave Northstar leave to replead them under Massachusetts law. *Id.*

Northstar repled the fiduciary duty causes of action in its Third Amended Complaint and also amended its allegations in an effort to remove their supposed focus on

---

brought under the law of the state of the organizing entity. 15 U.S.C. § 77p(d).

misrepresentations. Indeed, the Schwab defendants conceded in their motion to dismiss the Third Amended Complaint that "Northstar avoided SLUSA preemption for its fiduciary breach claims by asserting them under Massachusetts law and coming within the 'Delaware carve-out'"—a term used to describe an exception to SLUSA preemption if such a cause of action is available under the law of the state that had chartered or organized the entity issuing the securities. Def. Mot. to Dismiss Third Am. Compl. 13 n.5; *see* 15 U.S.C. § 77p(d)(1); *Madden v. Cowen & Co.*, 576 F.3d 957, 971 (9th Cir. 2009). Nevertheless, the district judge held that the fiduciary duty claims had to be brought derivatively, and dismissed them. *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 807 F. Supp. 2d 871, 876–81 (N.D. Cal. 2011). The district judge also held that Northstar could not assert a claim as a third-party beneficiary of the Investment Advisory Agreement. *Id.* at 881–84. Presumably because she had dismissed the breach of contract cause of action in the Second Amended Complaint with prejudice, she did not address Northstar's arguments as to these claims in the Third Amended Complaint. Nor did the district judge decide whether the allegations in the Third Amended Complaint survived under SLUSA.

As we discuss in detail below, we reverse the district court's dismissal of the breach of contract claims for failure to allege a contract between the shareholders and the Fund. We also reverse the district court's dismissal of the fiduciary duty and third-party beneficiary claims. We do not, however, reach the question of whether any of Northstar's claims are barred by SLUSA. The district court has not yet had the need to determine whether the allegations in the Third Amended Complaint can survive under SLUSA, and should do so in the first instance. *See, e.g.*, *Haskell v. Harris*, 745 F.3d 1269,

1271 (9th Cir. 2014) ("[W]e are a court of review, not first view.").

With this as a backdrop, we proceed to discuss the merits of Northstar's complaint.

## A.  *Breach of Contract Claim*

Northstar argues that, once the shareholders approved the proposals regarding the fundamental investment objectives of the Schwab Trust, which were described in the proxy statement, the Schwab Trust was contractually obligated to comply with them in managing the Fund.   Moreover, Northstar argues that the subsequent dissemination of the fundamental investment objectives in the registration statement and prospectuses formed a contract between the Schwab Trust and the "existing investors [who] retained shares and new investors [who] purchased shares in consideration for Schwab's contractual obligations." Appellant's Br. at 21; *see also* Appellant's Reply Br. at 7 n.8.

The Restatement (Second) of Contracts provides that "[a] promise may be stated in words either oral or written, or may be inferred wholly or partly from conduct."   Restatement (Second) of Contracts § 4 (1981).  While contracts are often spoken of as express or implied, "[t]he distinction involves . . . no difference in legal effect, but lies merely in the mode of manifesting assent."   *Id.* cmt. *a.*   "Just as assent may be manifested by words or other conduct, sometimes including silence, so intention to make a promise may be manifested in language or by implication from other circumstances, including course of dealing or usage of trade or course of performance."   *Id.*   "The distinction between an express and an implied contract, therefore, is of little importance, if it can

be said to exist at all."  1 Joseph M. Perillo, *Corbin on Contracts* § 1.19 at 57 (rev. ed. 1993); *see also* 1 Richard A. Lord, *Williston on Contracts* § 1:5 at 37–38 (4th ed. 2007) ("An implied-in-fact contract requires proof of the same elements necessary to evidence an express contract: mutual assent or offer and acceptance, consideration, legal capacity and a lawful subject matter.").

While it is not necessary to characterize the contract here as either express or implied, a particularly instructive discussion of the concept of implied contracts, in circumstances analogous to those present here, appears in *Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518 (1819), one of the earliest cases applying Article I, Section 10 of the Constitution, which provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts."  The case arose out of an effort by the State of New Hampshire to alter the terms of a corporate charter that had provided certain guarantees as to the structure and governance of Dartmouth College.  As Professor Tribe succinctly describes it, the Supreme Court "held that New Hampshire could not pack the Dartmouth College board of trustees and alter its faculty so as to change the college into a public institution in violation of its 1769 charter from George III."  Laurence H. Tribe, *American Constitutional Law* 614 (2d ed. 1988).  Of particular relevance here is the concurring opinion of Justice Story, who began his discussion of this issue by describing the creation of the corporation and the terms of its charter.  Specifically, he observed:

> The corporation was expressly created for the purpose of distributing in perpetuity the charitable donations of private benefactors. By the terms of the charter, the trustees, and

their successors, in their corporate capacity, were to receive, hold and exclusively manage all the funds so contributed. The crown, then, upon the face of the charter, pledged its faith that the donations of private benefactors should be perpetually devoted to their original purposes, without any interference on its own part, and should be for ever administered by the trustees of the corporation, unless its corporate franchises should be taken away by due process of law.

*Dartmouth College*, 17 U.S. (4 Wheat.) at 689.

Justice Story then identified two implied contracts in this circumstance. First, "there was an implied contract on the part of the crown, with every benefactor, that if he would give his money, it should be deemed a charity protected by the charter, and be administered by the corporation, according to the general law of the land. As, soon, then, as a donation was made to the corporation, there was an implied contract . . . that the crown would not revoke or alter the charter, or change its administration, without the consent of the corporation." *Id.* Second, "[t]here was also an implied contract between the corporation itself, and every benefactor, upon a like consideration, that it would administer his bounty according to the terms, and for the objects stipulated in the charter." *Id.* at 689–90.[6]

---

[6] Justice Story's opinion was a concurrence and was joined by Justice Livingston. The opinion of the Court was written by Chief Justice Marshall, who agreed that the charter constituted a contract. *Id.* at 643–44, 651.

The fundamental investment objectives of the Schwab Total Bond Market Fund can be analyzed in the same manner. Indeed, when they were adopted by the shareholders, they added a structural restriction on the power conferred on the Trustees in the Agreement and Declaration of Trust that can only be changed by a vote of the shareholders. This created a "contract between the [Trustees themselves], and every [investor]"—that the Schwab Trust "would administer his [investment] according to the terms, and for the objects stipulated in the" two restrictions adopted by the shareholders of the Fund. *Id.* at 690–91. Significantly, after the shareholders voted in favor of the proxy statement that included these restrictions, they were subsequently reflected in the Fund's registration statements and prospectuses. Thus, anyone who purchased shares in the Fund after 1997, or held shares that he then owned, was legally and contractually entitled to have his investment managed in accordance with the proposals in the proxy statement, unless the shareholders voted to permit otherwise.

The defendants argue that undertakings in SEC filings themselves cannot reflect contractual obligations that can be enforced in a suit for breach of contract. This argument cannot be reconciled with *Lapidus v. Hecht*, 232 F.3d 679 (9th Cir. 2000), where the plaintiffs sought "to recover losses sustained by the mutual funds as a result of short sales made without shareholder approval, allegedly in violation of the registration statement filed with the Securities and Exchange Commission." *Id.* at 680. Specifically, the defendant, a Massachusetts business trust, had filed a "prospectus . . . with the SEC [that] provided that the trust could engage in short sales of securities with a value of up to 25% of the value of

the mutual fund's total assets."[7]  *Id*. at 681.  The trust later issued an amended prospectus which "authorized the trust to enter into short sales of securities with a value of up to 40% of the mutual fund's total assets."  *Id*.  Nevertheless, "[t]his amendment to the short sales restriction was made without shareholder approval" and, subsequently, "the mutual fund's short sale position had increased to 25–35% of the mutual fund's assets and the mutual fund suffered substantial losses." *Id*.

On appeal, we addressed whether the plaintiffs could bring their action for violations of the ICA directly against the defendant or whether the action had to be brought derivatively.  We held that the *Lapidus* plaintiffs had adequately alleged an injury "predicated upon a violation of [the] shareholder's voting rights," *id*. at 683 (citing cases), and that those "allegations are sufficient to satisfy the injury requirement for a direct action under Massachusetts law," *id*. Significantly, the violation held to be adequately alleged was of the plaintiffs' "*contractual rights as shareholders* to vote on proposed changes to the short sale and senior security restrictions."  *Id*. (emphasis added).  These restrictions were spelled out in the registration statement, *id*., and in the "prospectus filed with the SEC," *id*. at 681.  *Lapidus*'s holding is directly applicable here because Northstar's breach of contract cause of action rests on the deviation by defendants from two fundamental investment objectives, which required a shareholder vote to be changed, without first

---

[7] A registration statement must "include[] the information required in a Fund's prospectus[.]"  Sec. & Exch. Comm'n, Form N-1A at 7, *available at* http://www.sec.gov/about/forms/formn-1a.pdf (last visited Aug. 29, 2013).  *Lapidus* appears to use the terms "registration statement" and "prospectus" interchangeably.

obtaining shareholder approval. Until the fundamental investment objectives were amended by shareholder vote, the investors had a contractual right to have the Fund managed in accordance with those objectives.[8]

*McKesson HBOC, Inc. v. New York State Common Retirement Fund, Inc.*, 339 F.3d 1087 (9th Cir. 2003), upon which the district judge relied, does not support the defendants' argument. In that case:

> McKesson HBOC [sued] its own shareholders for unjust enrichment arising from a merger between McKesson and HBO & Company ("HBOC"). McKesson claim[ed] that the former HBOC shareholders [we]re the beneficiaries of a windfall triggered by alleged accounting improprieties by HBOC. The shareholders, according to McKesson, exchanged artificially inflated shares of HBOC for fully-valued McKesson shares in the merger transaction. McKesson [wanted] to recover the excess value from the shareholders.

*Id*. at 1089. McKesson sought recovery for unjust enrichment, which was potentially available only if there was no governing contract between the parties. *Id*. at 1089, 1091. While *McKesson HBOC* ultimately held that there was no

---

[8] We rely on *Lapidus* at this juncture solely for its holding that undertakings in SEC filings may give rise to an implied contractual obligation. We discuss at pages 44 to 46 below, the effect of the holding of *Lapidus* on whether an action for breach of contract and breach of fiduciary duty may be brought directly.

recovery for unjust enrichment, even if there were no governing contract, it first addressed whether the Merger Agreement or the relevant Proxy Statement/Prospectus ("Prospectus") was a contract that governed McKesson's claims against the shareholders.

First, *McKesson HBOC* held that "it is clear from the text and the signatories to the agreement that the only parties to the Merger Agreement were the corporations themselves." *Id*. at 1091. Second, it held that "the Prospectus was not an offer by McKesson to the HBOC shareholders to enter into a bilateral contract separate and apart from the Merger Agreement." *Id*. at 1092. Specifically, *McKesson HBOC* explained that, although the "Prospectus references the Merger Agreement, advising shareholders that '[t]he merger cannot be completed unless the stockholders of both companies approve the merger agreement and the transactions associated with it,'" such "references do not . . . convert McKesson's solicitation of the shareholders' vote into a contractual offer." *Id*. Thus, *McKesson HBOC* concluded that "the Prospectus did not serve as the basis for a contract between McKesson and the shareholders." *Id*. at 1093.

Significantly, *McKesson HBOC* distinguished the scenario it addressed from a "tender offer situation, where the courts have found a contract between the corporation and an individual shareholder who tenders shares[.]" *Id*. at 1092; *see also* 6A Fletcher Cyc. Corp. § 2841.10 at 358 (rev. ed. 2013) ("A binding contract is created when the shareholder tenders his or her securities in accordance with the terms of the offer."). Unlike a tender offer, "the shareholders [in McKesson] did not tender their shares." *McKesson HBOC*, 339 F.3d at 1092–93. Moreover, "shareholders who objected

to the merger could not separately opt out or contract out of the merger.  Individual shareholders were not in a position of contracting with McKesson, and shareholder ratification did not convert the Prospectus into a contract." *Id* at 1093.

This case is clearly distinguishable from *McKesson HBOC*.  First, the parties to the contract at issue in this case are the Trustees and the shareholders of the Fund.  Second, the breach of contract cause of action is predicated, in part, on the approval of the fundamental investment objectives by the shareholders.  Once those objectives were adopted, they significantly restricted the discretion which the Agreement and Declaration of Trust conferred on the Schwab Trust to manage the Fund.  Moreover, the Fund's registration statement and prospectuses reflected the adoption of those restrictions.  The acquisition of the securities constituted an acceptance of the offer.

Nor does *In re Charles Schwab Corp. Securities Litigation*, No. C 08-01510 WHA, 2009 WL 1371409 (N.D. Cal. May 15, 2009) [hereinafter "*Charles Schwab*"], on which defendants rely, and which involved legal issues comparable to this case, constitute persuasive authority to the contrary.  The district judge there first stated that "[t]he Ninth Circuit has never addressed whether mutual fund disclosure documents constitute a contract under these precise circumstances." *Id*. at *3.  Nevertheless, as *Lapidus* makes clear, this is not an accurate statement of Ninth Circuit law. *See* 232 F.3d at 683.  Moreover, we do not find persuasive the argument that *Lapidus* is distinguishable because it "did not involve contract claims but rather statutory claims under the [ICA.]" *Charles Schwab*, 2009 WL 1371409, at *5.  The plaintiffs' ability in *Lapidus* to bring a direct action under the ICA was based upon a breach of their "contractual rights as

shareholders to vote on proposed changes to the short sale and senior security restrictions[.]" *Lapidus*, 232 F.3d at 683. These contractual rights were derived from the registration statement and the prospectus. *Id*. at 681, 683.

We find equally unpersuasive the argument that "the prospectuses . . . here at issue are not contracts but rather are *mandatory* regulatory disclosure documents." *Charles Schwab*, 2009 WL 1371409, at *3. The prospectus, which is the primary selling document, offers to sell shares to investors in a mutual fund which will invest the proceeds in the manner described in the prospectus, unless shareholders approve a proposal to do otherwise. Indeed, the Securities and Exchange Commission urges investors to "request and read the fund's prospectus before making an investment decision." *Mutual Fund Prospectus*, Sec. & Exch. Comm'n, http://www.sec.gov/answers/mfprospectustips.htm (last visited Sept. 5, 2014). The mere fact that Congress has chosen to ensure that investors are fully informed of the fundamental investment objectives of mutual funds hardly provides a license to ignore the objectives, enshrined by shareholder approval, which a mutual fund has obligated itself to pursue. Nor does it alter the fact that the purchase of those shares constitutes an acceptance of the offer by the investor. Indeed, as previously observed, this is precisely how the shareholders became parties to the Agreement and Declaration of Trust. Agreement and Declaration of Trust 4 ("Every Shareholder by virtue of having become a Shareholder shall be held to have expressly assented and agreed to the terms hereof and to have become a party hereto.").

Moreover, the district judge in *Charles Schwab* did not cite any authority for his suggestion that a "mandatory

regulatory disclosure document" cannot form the basis for an implied contract. *Lapidus* holds otherwise and the district judge in *Charles Schwab* acknowledged that, "in certain circumstances prospectuses can constitute a contract." *Charles Schwab*, 2009 WL 1371409, at *5. Indeed, even before the enactment of the Securities Act of 1933, "the term 'prospectus' was well understood to refer to a document soliciting the public to acquire securities from the issuer." *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995) (citing *Black's Law Dictionary* 959 (2d ed. 1910)).

In sum, we conclude that the mailing of the proxy statement and the adoption of the two fundamental investment policies after the shareholders voted to approve them, and the annual representations by the Fund that it would follow these policies are sufficient to form a contract between the shareholders on the one hand and the Fund and the Trust on the other. The Fund offered the shareholders the right to invest on these terms, and the shareholders accepted by so investing. The consideration for the contract was the shareholders' investment, or continued investment, in the Fund, and the parties' object was lawful. The conduct of the parties thus fulfills all the requirements for a binding contract under traditional common law principles. *See* Lord, *Williston on Contracts* § 1:5 at 37–38 (4th ed. 2007).

We are aware that Judge Koh held that, under the particular circumstances of this case, Northstar failed to successfully allege the formation and breach of a contract. 781 F. Supp. 2d at 939. She reasoned that:

> [A] September 1, 2006 Statement of Additional Information was issued which stated that the Fund would, from then on,

> cease to treat "mortgage-backed securities issued by private lenders" as a separate industry and therefore could invest more than 25% of the Fund's assets in this area would seem to defeat Plaintiffs' contract claim. If this became a term of the contract between Plaintiffs and the Trust when investors held or subsequently purchased shares, then the Trust could not have breached this contract by over-investing in MBS, as Plaintiffs claim.

*Id.* at 940.

We are not persuaded. Northstar alleged that the SAI's statement that "the funds have determined that mortgage-backed securities issued by private lenders are not part of any industry for the purposes of the funds' concentration policies," *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, No. 5:08-cv-04119-LHK (N.D. Cal.), Statement of Additional Information (Sept. 1, 2006) at 8, Doc. No. 152-2, was an improper attempt to circumvent the Fund's concentration policy that limited investment in one industry to 25% of its assets because no vote was taken to approve it. This position was supported by a complaint filed by the Securities and Exchange Commission, which alleged "that the Schwab trust deviated from its policy on concentration for the Schwab Total Bond Market Fund . . . by deciding to not treat mortgage-backed securities as an industry without shareholder approval." Appellees' Br. 13 (citing *SEC v. Charles Schwab Inv. Mgmt. Inc.*, No. 11-cv-00136 (N.D. Cal.), Compl. ¶¶ 24–28, Doc. No. 1).

Specifically, the SEC charged that before August 2006, the 25% concentration policy stated that "[b]ased on

characteristics of mortgage-backed securities, [the Total Bond Fund] has identified mortgage-backed securities issued by private lenders and not guaranteed by the U.S. government agencies or instrumentalities as a separate industry for purposes of [the] fund's concentration policy." *SEC v. Charles Schwab Inv. Mgmt. Inc.*, No. 11-cv-00136 (N.D. Cal.), Compl. ¶ 25, Doc. No. 1; *see also* Schwab Investments, Statement of Additional Information (Form N-1A, Part B) 9 (Nov. 15, 2004). The position of the SEC was that, because Schwab had identified mortgage-backed securities issued by private lenders as an industry, "the Total Bond Fund could not invest more than 25% of [its] assets in non-agency MBS without obtaining shareholder approval under Section 13(a)" of the ICA. *SEC v. Charles Schwab Schwab Inv. Mgmt. Inc.*, No. 11-cv-00136 (N.D. Cal.), Compl. ¶ 25.

Judge Koh's reliance on the September 1, 2006 SAI, even if correct, overlooks the fact that the Fund's concentration policy was only one of the two fundamental investment objectives from which the defendants could not depart without shareholder approval. The primary violation was "causing the Fund to deviate from its fundamental investment objective to 'seek to track the investment results' of the Lehman Brothers U.S. Aggregate Bond Index . . . 'through the use of an indexing strategy.'" The complaint then goes on to allege that the "Fund also deviated from its stated fundamental investment objective by investing more than 25% of its total assets in U.S. agency and non-agency mortgage-backed securities and CMOs."

The SAI did not provide any notice that the defendants intended to depart from the first of the fundamental objectives which obligated the Fund to "seek to track the investment results" of the Lehman Index. Thus, even if Judge Koh was

correct in her analysis with respect to the breach of the second investment objective, as to which notice was provided in the SAI, the complaint still sufficiently states a claim for breach of contract.  This is true with respect to those who purchased before September 1, 2006 and held on to their shares afterward, and those who purchased after that date.

Particularly as to those who purchased before September 1, 2006 and held onto their shares, we are not prepared to assume that the SAI itself was sufficient to provide adequate notice.  An SAI, "affords the Fund an opportunity to expand discussions of the matters described in the prospectus by including additional information that the Fund believes may be of interest to some investors."  Glazer, *Prospectus Disclosure and Delivery Requirements*, *in Mutual Fund Regulation* § 4:3.2 (quoting Sec. & Exch. Comm'n, Form N-1A at 7, *available at* http://www.sec.gov/about/forms/formn-1a.pdf (last visited Sept. 5, 2014)).  "The SAI is not automatically provided investors but must be available free of charge upon request."  *Id*.  Moreover, the SAI may be specifically incorporated "by reference into the prospectus without delivering the SAI with the prospectus."  *Id*. § 4:3.1[D].  While there may be sophisticated shareholders who make the effort to ask for an SAI or read it with the care necessary to digest the relevant parts of a long and multifaceted document, we think it is reasonable to assume that there are many ordinary shareholders who do not do so.  Indeed, even if a mutual fund could alter a fundamental investment objective by the vehicle of an SAI, it should provide current shareholders with clear and unambiguous notice of the alteration that it wishes to make.

### B. Breach of Fiduciary Duty Claim

Northstar alleged that the Schwab defendants breached their fiduciary duties by failing to ensure that the Fund was managed in accordance with the fundamental investment objectives and by changing the Fund's fundamental investment objectives without obtaining required shareholder authorization. The district judge held that Northstar "failed to successfully allege a breach of any duty owed directly to Fund investors, and that these claims would have to be asserted derivatively." *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 807 F. Supp. 2d 871, 876 (N.D. Cal. 2011).

Defendants conceded at oral argument that the allegations in the operative complaint are sufficient to state a cause of action for breach of fiduciary duty. They argue, however, that the Trustees did not owe a fiduciary duty to the beneficiaries of the Schwab Trust—namely, the shareholders. Instead, they argue that because of the "close resemblance of a mutual fund operated as a Massachusetts Business Trust to a corporation," the Trustees should be treated in the same way as corporate directors, who "owe fiduciary duties to the corporation rather than to its shareholders." Appellees' Br. at 48. This argument provides the predicate for the claim that Northstar was required to proceed by way of a derivative action.

There are several deficiencies in this argument. First, it simply ignores the plain terms of the Agreement and Declaration of Trust.

The document states expressly that:

> the Trustees hereby declare that they will hold all cash, securities and other assets, which they may from time to time acquire in any manner as Trustees hereunder IN TRUST to manage and dispose of the same . . . for the pro rata benefit of the holders from time to time of Shares in this Trust.

Agreement and Declaration of Trust 1. We are not aware of any Massachusetts case that holds that agreements of this kind cannot be enforced directly by the beneficiaries of a trust.

Second, the Supreme Judicial Court of Massachusetts has held that "[i]t is axiomatic that the . . . trustees [stand] in a fiduciary relationship to all the beneficiaries of the trust." *Fogelin v. Nordblom*, 521 N.E.2d 1007, 1011 (Mass. 1988); *see also* Dukeminier, Sitkoff & Lindgren, *Wills, Trusts, and Estates* 556 ("In managing the portfolio, [the trustee] is subject to a fiduciary obligation to" the investors in the mutual fund); John H. Langbein, *The Secret Life of the Trust: The Trust as an Instrument of Commerce*, 107 Yale L.J. 165, 166 (1997) ("The familiar standards of trust fiduciary law protect trust beneficiaries of all sorts, regardless of whether the trust implements a gift or a business deal (unless, of course, the terms of the transaction expressly contraindicate)."). While the Supreme Judicial Court of Massachusetts has acknowledged similarities between corporations and business trusts, it has held that business trusts "are not corporations, nor are they entities apart from the trustees." *Swartz v. Sher*, 184 N.E.2d 51, 53 (1962). Under these circumstances, there is no logical basis for the

argument that the trustees of a mutual fund organized as a Massachusetts business trust owe a fiduciary duty to the trust, rather than the shareholders, and that for this reason they are limited to a derivative action on behalf of the trust.

*Lapidus v. Hecht*, 232 F.3d 679 (9th Cir. 2000), upon which defendants rely, does not support their position. *Lapidus* involved two discrete claims of wrongdoing. The first, which is comparable to the cause of action here, was based on deviations from the investment objectives of the mutual fund and the issuance of senior securities without shareholder approval. *Id.* at 681 (citing 15 U.S.C. § 80a-13(a)(2)–(3)). The second cause of action involved the issuance of senior securities in violation of section 15 U.S.C. § 80a-18(f).

*Lapidus* first addressed the issue of whether a direct action could be brought for the departure from the mutual fund's investment objectives and the issuance of senior securities without shareholder approval. *Lapidus*, 232 F.3d at 683. We held that, "[t]o bring a direct action under Massachusetts law, a plaintiff must allege an injury distinct from that suffered by shareholders generally *or* a wrong involving one of his or her contractual rights, *such as* the right to vote. *Lapidus*, 232 F.3d at 683 (emphasis added). We then went on to observe that the plaintiffs alleged "violations of their contractual rights as shareholders to vote on proposed changes to the short sale and senior security restrictions." *Id.* Such claims could be brought directly. *Id.*

*Lapidus* then addressed the second cause of action based on "the allegedly improper issuance of senior securities," *id.* at 683, in violation of federal law, *id.* at 681 n.3. This action could not be brought directly because it failed both parts of

the disjunctive test. First, the injury was not distinct from the injury to all shareholders holding the same series of stock because the alleged improper "issuance of senior securities . . . would be an injury to the trust generally." *Id.* at 683. Second, the alleged improper issuance was "unconnected to any violation of voting rights" or any other contractual right. *Id.*

The first prong of the test was applied with respect to both causes of action in *Lapidus*, namely, that to bring a direct action under Massachusetts/Delaware law, "a plaintiff must allege an injury distinct from that suffered by shareholders generally." *Id.* We refer to "Massachusetts/Delaware" law because *Lapidus* relied on two Delaware cases and one Massachusetts case applying Delaware law for the circumstances under which a direct action may be brought "under Massachusetts law[.]" 232 F.3d at 683. The Delaware law has since changed. Thus, in *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031, 1036–39 (Del. 2004), the Supreme Court of Delaware rejected, as "confusing," the concept "that an action cannot be direct if all stockholders are equally affected or unless the stockholder's injury is separate and distinct from that suffered by other stockholders." *Id.* at 1038–39.

Moreover, even if that prong survived the holding in *Tooley*, a direct action in this case would be appropriate under the second prong of the disjunctive test applied in *Lapidus* because the plaintiffs allege "a wrong involving one of [their] contractual rights as . . . shareholder[s]." 232 F.3d at 683. Northstar's breach of contract cause of action rests on the deviation by defendants from two fundamental investment objectives, which required a shareholder vote change, without first obtaining shareholder approval. The right to vote,

however, is not the only contractual right at issue. Instead, it is inextricably intertwined with the restrictions placed on the power of the Trustees to invest the assets of the Fund. Until the fundamental investment objectives were amended by shareholder vote, the investors had a contractual right to have the Fund managed in accordance with those objectives.

The third deficiency in defendants' argument that this action must be brought derivatively is that the distinction between direct and derivative actions has little meaning in the context of mutual funds, at least on the facts present here. A publicly held corporation, in contrast to a mutual fund, engages in a business, *e.g.*, the buying and selling of widgets, in which the accretion of share price is generally the by-product of business success, and the depletion of share price can be the by-product of either unsuccessful business decisions or misconduct by fiduciaries. The particular facts in the latter scenario will determine whether claims against corporate officers are derivative or direct in nature (or both). *See Tooley*, 845 A.2d 1031. In a mutual fund, however, there is no business other than acquiring investment instruments for the purpose of increasing the net asset value "for the pro rata benefit of the holders . . . of Shares in this Trust." Agreement and Declaration of Trust 1. Any decrease in a mutual fund's share price flows directly and immediately to the shareholders. This is particularly true when such an injury results from the failure to comply with a fund's fundamental investment objectives. Thus, such misconduct supports a direct action.

There may be scenarios where a mutual fund trustee can be sued only derivatively—for example, if he embezzles assets held by the fund, the injury may be first to the mutual fund and only secondarily to the investors in the fund. But

that is not this case.  Rather, this case alleges a failure to follow trading restrictions, the very essence of the Fund's business, which, accepting the allegations as true, caused a diminution in shareholder value.  The claim supports a direct action because the impact is directly on the investors in the Fund and a recovery would not be dependent on demonstrating an injury to the Schwab Trust.  *Cf. Tooley*, 845 A.2d at 1039 (holding that a corporate stockholder who brings a direct action "must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation").

Even if we were to accept defendants' attempt to analogize the Fund to a publicly held corporation, their argument that Northstar may only sue derivatively would fail.  Significantly, the Principles of Corporate Governance promulgated by the American Law Institute ("ALI") recognize that in circumstances comparable to this case, a direct action may be appropriate.  Thus, in a comment to § 7.01, the section that is captioned "Direct and Derivative Actions Distinguished," the ALI observes:

> In some instances, actions that essentially involve the structural relationship of the shareholder to the corporation (which thus should be seen as direct actions) may also give rise to a derivative action when the corporation suffers or is threatened with a loss.  One example would be a case in which a corporate official knowingly acts in a manner that the certificate of incorporation denied the official authority to do, thereby violating both specific restraints imposed by the shareholders and the official's duty of

care. In such cases, the plaintiff may opt to plead either a direct or a derivative action, or to bring both actions simultaneously, unless the court finds that the plaintiff is unable to provide fair and adequate representation pursuant to § 7.02(a)(4) (Standing to Commence and Maintain a Derivative Action).

American Law Institute, *Principles of Corporate Governance* § 7.01, cmt. *c* (1994).[9]

The present case involves the same kind of structural relationship of shareholders to the Schwab Trust that the foregoing comment addresses. Of course, we deal here with an agreement and declaration of trust rather than a certificate of incorporation. The adoption by the shareholders of the fundamental investment objectives of the Fund effectively imposed a restraint on the structural relationship in the

---

[9] The Chief Reporter's foreword states that "Comments express the views of the [American Law] Institute." ALI, *Principles of Corporate Governance* XXV. Section 7.01, to which this comment applies, has been repeatedly cited with favor by the Supreme Court of Delaware. *See Tooley*, 845 A.2d at 1036; *Grimes v. Donald*, 673 A.2d 1207 (Del. 1996), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). Indeed, in *Grimes*, the Supreme Court of Delaware expressly cited and applied the comment quoted above. *Id.* at 1213. While the present case does not directly involve the application of Delaware law, Delaware has been described aptly as "by far the most important corporate jurisdiction[.]" Melvin Aron Eisenberg & James D. Cox, *Corporations and Other Business Organizations* 1031 (10th ed. 2011). Indeed, as we previously observed, in *Lapidus* we relied on two Delaware cases and one Massachusetts case applying Delaware law for the circumstances under which a direct action may be brought "under Massachusetts law[.]" 232 F.3d at 683.

Agreement and Declaration of Trust comparable to an amendment of a certificate of incorporation. The allegations in the complaint, although not *in haec verba*, are sufficient to support an argument that the Trustees "violat[ed] both specific restraints imposed by the shareholders and the official[s'] duty of care." ALI, *Principles of Corporate Governance* § 7.01, cmt. *c*. Thus, even if the same rules that apply to corporations are applied to the Schwab Trust, this is the kind of case in which "the plaintiff may opt to plead either a direct or a derivative action[.]" *Id*.

Moreover, there is another reason, directly rooted in Massachusetts case law, which provides a basis for permitting a direct action even against a corporation. While Massachusetts cases generally preclude direct actions "where corporate recovery for misdeeds by a corporate fiduciary is available under traditional corporate law," they contain the significant caveat that "such recovery [must] provide[] a just measure of relief to the complaining stockholder[.]" *Crowley v. Commc'ns for Hosps., Inc.*, 573 N.E.2d 996, 1004 (Mass. App. Ct. 1991); *see also Diamond v. Pappathanasi*, 25 Mass. L. Rptr. 500, 2009 WL 1539792, at \*7 (Mass. Super. Ct. 2009) ("[S]hareholders may resort to a direct, personal action against a miscreant fiduciary where . . . a corporate recovery would not provide a just measure of relief to the complaining shareholder."). We have likewise acknowledged that, even where corporate shareholders have been relegated to pursue their claims in a derivative action, a direct action may be appropriate to provide a remedy to shareholders who have been injured and who would not recover under the traditional rules governing derivative actions. *See*, *e.g.*, *Eagle v. Am. Tel. & Tel. Co.*, 769 F.2d 541, 546 (9th Cir. 1985).

This case is one in which a recovery by the Schwab Trust "would not provide a just measure of relief to the complaining shareholder." *Diamond*, 2009 WL 1539792, at *7. Any recovery in a derivative action would simply increase the net asset value of the Fund at the time any damages were recovered. Consequently, as defendants conceded at oral argument, if a derivative suit is successfully prosecuted, all current shareholders would participate in the recovery by the Schwab Trust even if they were not shareholders during the relevant time period, and injured former shareholders would not necessarily participate in the recovery at all.

Significantly, the remedy agreed to in an enforcement action by the SEC avoids such "a[n] [un]just measure of relief to the complaining [shareholders]." *Crowley*, 573 N.E.2d at 1004. The action, as we have previously observed, was based on the allegation "that the Schwab Trust improperly deviated from its policy on concentration for the [Fund] . . . by deciding to not treat mortgage-backed securities as an industry without shareholder approval." Appellees' Br. at 13 (citing *SEC v. Charles Schwab Inv. Mgmt. Inc.*, No. 11-cv-00136 (N.D. Cal.), Compl. ¶¶ 24–28, Doc. No. 1). A consent judgment was entered requiring the Schwab Trust to disgorge profits and prejudgment interest. Appellees' Br. at 13–14 (citing *SEC v. Charles Schwab Inv. Mgmt. Inc.*, No. 11-cv-00136 (N.D. Cal.), Consent to Enter J. ¶ 2, Doc. No. 2). The Schwab Trust, however, did not share in the recovery. Instead, the settlement proceeds were deposited by the defendants into "a fund for distribution to adversely affected investors, including investors in the [Fund.]" Appellees' Br. at 14 (citing *SEC v. Charles Schwab Inv. Mgmt. Inc.*, No. 11-cv-00136 (N.D. Cal.), Order Approving Distribution Plan

with Modification, Doc. No. 37). This kind of remedy could be obtained if this direct class action is successful.

*Halebian v. Berv*, 931 N.E.2d 986 (Mass. 2010), upon which defendants rely, does not compel a contrary result. The defendants correctly argue that *Halebian* held, in an appropriate case, a shareholder of a mutual fund may be forced to resort to making a demand on the Trustees to file a derivative action. Nevertheless, *Halebian* did not address the circumstances under which such a course of action would be required. Instead, it held that "the statute regulating derivative actions [Mass. Gen. Laws ch. 156D, §§ 7.40–7.47] applies to a shareholder bringing such a claim against a corporation or a business trust." *Id.* at 988 n.4. Because the plaintiff had filed a derivative action, *Halebian* went on to address the narrow issue of "whether the Legislature intended that the provisions for dismissal under § 7.44 apply *only* to derivative proceedings that are 'commenced after rejection of a demand,' or to any derivative proceeding where a plaintiff shareholder's demand has been rejected by the corporation." *Id.* at 989.

Moreover, the allegations in that case were quite unlike the misconduct alleged here. In *Halebian*, the plaintiff claimed that the trustees failed to engage in competitive bidding in their selection of an investment adviser. *Id.* at 988. A derivative suit was arguably appropriate in the case because the injury to the shareholders was the attenuated result of an improper trust expenditure (the investment adviser's fee).

Nor are we persuaded by the policy arguments defendants rely on to support treating this case as a derivative action. Defendants argue that "[b]y requiring shareholders to demand

that a corporation bring a claim before filing a derivative action, derivative action rules allow disinterested directors to halt suits that are meritless or contrary to the corporation's interest and allow them to exercise their judgment and oversee litigation in the best interest of the company." Appellees' Br. at 46–47 (citing Mass. Gen. Laws ch 156D, § 7.42; *Daily Income Fund*, 464 U.S. at 533; *Halebian*, 457 Mass. at 626). Moreover, they go on to argue that, "applying derivative action rules in this context . . . ensures that disinterested trustees remain primarily responsible for management of a trust's litigation." Appellees' Br. at 47. This argument is particularly unpersuasive in light of the manner in which Massachusetts business trusts that operate mutual funds conduct business. The Supreme Court has recognized that mutual funds are "typically organized and underwritten by the same firm that serves as the company's 'investment advisor.'" *Kamen*, 500 U.S. at 93. They are essentially puppets of the investment adviser.

Moreover, although fund boards have been required to include a percentage of independent directors, "the definition of 'independent' is fairly loose when it comes to fund board members[.]" Shipman, *So Who Owns Your Mutual Fund?*, Wall St. J., May 5, 2003, at R1. As one commentator has observed:

> An independent director can't be an employee of the fund investment adviser or a member of the immediate family of an employee. Other restrictions also apply. But former employees of the fund's investment adviser or the adviser's affiliates are considered to be independent when it comes to serving on a fund board. So, for example, Joseph S.

> DiMartino, who was president of Dreyfus Corp. for a dozen years before becoming chairman of the fund boards for the Dreyfus fund group, is considered an independent director.

*Id.* Indeed, notwithstanding the requirement that a percentage of the members of the mutual fund board be "independent" from the adviser, Congress required that the shareholders of the Fund annually approve the adviser contract. 15 U.S.C. § 80a-15. This requirement reflected the fact that the trustees of a mutual fund "cannot seriously be expected to induce arm's-length bargaining. As the SEC long ago recognized, any so-called independent directors would 'obviously have to be satisfactory to the dominating stockholders who are in a position to continue to elect a responsive board.'" *Fox*, 692 F.2d at 259 (quoting *In re Petroleum & Trading Corp.*, 11 S.E.C. 389, 393 (1942)). Under these circumstances, it is wrong to suggest that "applying derivative action rules in this context . . . ensures that disinterested trustees remain primarily responsible for management of a trust's litigation." Appellees' Br. at 47. This is particularly true here because one of the principal defendants, aside from the Trustees themselves, is the Schwab Advisor.

There are, of course, other "reasons . . . commonly advanced for distinguishing between a *derivative* action, which is brought on the corporation's behalf against either corporate fiduciaries or third persons, and a *direct* action, which is brought on a shareholder's own behalf against either corporate fiduciaries or the corporation itself." Eisenberg & Cox, *Corporations and Other Business Organizations* 1064. The first has been described as "theoretical: Since a corporation is a legal person separate from its shareholders,

an injury to the corporation is not an injury to its shareholders.  This proposition is somewhat dubious, because every injury to a corporation must also have an impact, however slight, on the shareholders as well."  *Id*.  The other, and more compelling, reasons of policy are summed up in *Watson v. Button* as follows:  "(1) to avoid a multiplicity of suits by each injured shareholder, (2) to protect the corporate creditors, and (3) to protect all the stockholders since a corporate recovery benefits all equally."  235 F.2d 235, 237 (9th Cir. 1956); *see also* Eisenberg & Cox, *Corporations and Other Business Organizations* 1064.  Significantly, two of these three policy objectives, which defendants also put forward here, are ameliorated by the very nature of the class action, which is designed to avoid a multiplicity of suits by shareholders and which contain procedural mechanisms to ensure that all members of the class are treated equally. Moreover, to the extent that one of the reasons for favoring a derivative suit is a concern for the protection of creditors, it is enough to say here that the defendants do not argue that the concern is at issue in this case.

## C. *Third-Party Beneficiary Breach of Contract Claims*

The Schwab Trust entered into an agreement with the Schwab Advisor to serve as its investment adviser and administrator of the Fund.  The Schwab Advisor expressly agreed to "use the same skill and care in providing such services as it would use in providing services to fiduciary accounts if it had investment responsibilities for such accounts."  The principal duty of the Schwab Advisor, as prescribed in the IAA with the Schwab Trust, was to "determine from time to time what securities and other investments [would] be purchased, retained, or sold by the [Fund]."  This agreement with the Schwab Advisor was

expressly approved by the shareholders of the Fund. Northstar alleges that the Schwab Advisor breached the IAA by managing the Fund in a manner inconsistent with the Fund's fundamental investment objectives, and that the shareholders may hold the Schwab Advisor liable for such a breach as third-party beneficiaries of the IAA.

The IAA expressly states that it "shall be governed by the laws of the State of California." Under California Civil Code § 1559, a critical element of a third-party cause of action is a showing that the contract was "made expressly for the benefit of a third person." The phrase, however, has been held not to mean "exclusively," *Hartman Ranch Co. v. Associated Oil Co.*, 73 P.2d 1163, 1170 (Cal. 1937), "solely," *Le Ballister v. Redwood Theatres, Inc.*, 36 P.2d 827, 827 (Cal. Dist. Ct. App. 1934), or "primar[il]y," *Montgomery v. Dorn*, 145 P. 148, 151 (Cal. Dist. Ct. App. 1914), for the benefit of a third person. Similarly, the term has been construed not to require that performance be rendered "directly" to the beneficiary, *Lucas v. Hamm*, 364 P.2d 685, 688 (Cal. 1961), or that the beneficiary be specifically named or identified in the contract, *Garratt v. Baker*, 56 P.2d 225, 226 (Cal. 1936).

"Consequently, its connotative meaning having been destroyed by judicial interpretation, the term 'expressly' has now come to mean merely the negative of 'incidentally.'" Kay S. Bruce, Martinez v. Socoma Companies*: Problems in Determining Contract Beneficiaries' Rights*, 27 Hastings L. J. 137, 149 (1975) (footnotes omitted). Indeed, the Supreme Court of California has explicitly held that "[t]he effect of the section is to exclude enforcement by persons who are only incidentally or remotely benefited." *Lucas*, 364 P.2d at 689; *see also Spinks v. Equity Residential Briarwood Apartments*, 90 Cal. Rptr. 3d 453, 468 (Ct. App. 2009); Judith M. Kline &

Brent A. Olson, *California Business Law Deskbook* § 8:28 (2012).

Under these circumstances, the critical issue is "'[w]hether the third party is an intended beneficiary.'" *Balsam v. Tucows Inc.*, 627 F.3d 1158, 1161 (9th Cir. 2010) (quoting *Prouty v. Gores Tech. Grp.*, 18 Cal. Rptr. 3d 178, 184 (Ct. App. 2004)). The resolution of this issue, in turn, "'involves construction of the intention of the parties, gathered from reading the contract as a whole in light of the circumstances under which it was entered.'" *Id*. (quoting *Prouty*, 18 Cal. Rptr. 3d at 184); Restatement (Second) of Contracts § 302, reporter's note ("A court in determining the parties' intention should consider the circumstances surrounding the transaction as well as the actual language of the contract." (citing cases)). "Insofar as intent to benefit a third person is important in determining his right to bring an action under a contract, it is sufficient that the promisor must have understood that the promisee had such intent." *Lucas*, 364 P.2d at 689.

Northstar has adequately alleged an "intent to benefit a third person." Northstar has also plausibly alleged that the Schwab Advisor understood that it was the intent of the Schwab Trust to benefit the shareholders of the Fund. Moreover, compelling evidence lending plausibility to the third-party beneficiary cause of action, based on the premise that the shareholders are intended beneficiaries of the IAA, is that Congress has required "that the contract between the adviser and the company be approved by a majority of the company's shareholders." *Kamen*, 500 U.S. at 93 (citing 15 U.S.C. § 80a-15(a)); *see also Navellier v. Sletten*, 262 F.3d 923, 944 (9th Cir. 2001); David A. Sturms & Renee M.

Hardt, *Regulation of the Advisory Contract*, *in Mutual Fund Regulation* § 6:2.2 (Clifford E. Kirsch ed., 2d ed. 2005).

Thus, the agreement between the Schwab Trust and the Schwab Advisor explicitly provides "that it has been approved by a vote of a majority of the outstanding voting securities of such Schwab Fund, in accordance with the requirements under the [ICA]." This suffices to establish that the shareholders have more than a "remote" relationship to the contract between the Schwab Trust and the Schwab Advisor. Rather, it indicates the direct relationship that the shareholders have with the IAA and the fact that they are the actual beneficiaries of the IAA. Indeed, as we have held, the requirement for shareholder approval, which is imposed by the ICA, "reflect[s] the judgment of Congress that stockholders of the investment company have a substantial interest in evaluating the new owners of an investment manager." *Zell v. InterCapital Income Sec., Inc.*, 675 F.2d 1041, 1047 (9th Cir. 1982) (citing 15 U.S.C. § 80a-15(a)(4)).

The sufficiency of the complaint is also supported by a number of California cases. Specifically, in *Gilbert Financial Corp. v. Steelform Contracting Co.*, 145 Cal. Rptr. 448 (Ct. App. 1978), the plaintiff, a property owner, entered into a contract with a general contractor for the construction of a building. The general contractor subcontracted work to the defendant. The California Court of Appeal held that the plaintiff was an intended beneficiary of the subcontract between the general contractor and the defendant, even though the plaintiff was not specifically named. *Id*. at 450. Indeed, the allegations in the complaint demonstrated that the subcontractor had, in effect, assumed the role of the general contractor to provide construction services for the plaintiff, such that the plaintiff was the "ultimate beneficiary" of the

contract between the subcontractor and the general contractor. *Id*. at 451.

Applying the reasoning of *Gilbert*, the Fund's shareholders are comparable to the property owners, the Schwab Trust is comparable to the general contractor, and the Schwab Advisor is comparable to the subcontractor. The Schwab Trust engaged the Schwab Advisor to manage and operate the Fund in accordance with the fundamental investment objectives that the shareholders had adopted. In this situation, the Schwab Advisor's management of the Fund directly affected whether the Fund achieved its stated goal of tracking the Lehman Index. Thus, the "ultimate beneficiary" of the Schwab Advisor's contractual duties were the shareholders.

A more recent case, *Spinks v. Equity Residential Briarwood Apartments*, 90 Cal. Rptr. 3d 453 (Ct. App. 2009), is similarly analogous. In *Spinks*, an employer had contracted with a landlord to provide housing for an employee. Sometime thereafter, the employer terminated the employee and directed the landlord to change the locks on the employee's apartment, which the landlord did. The employee brought suit against the landlord as a third-party beneficiary of the contract between the employer and the landlord. The California Court of Appeal held that the employee had adequately alleged that she was an intended third-party beneficiary. *See id*. at 475. In so holding, the court noted that "the most basic aspect of [the landlord's] performance is its obligation to supply [the employer] with a place for its staff to live." *Id*. at 472. In the present case, "the most basic aspect" of the Schwab Advisor's performance—properly managing the Fund—is for the benefit of the shareholders.

Nor does the fact that the IAA contained an inurement clause providing that it "shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors," preclude a third-party beneficiary action in the context of this case.  The defendants cite cases holding that, because the parties specified one particular beneficiary in the contract, other beneficiaries are excluded.  These cases are not dispositive.  The cases upon which the defendants rely do not speak to this issue or are not controlling.  For instance, *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206 (9th Cir. 1999), involved a governmental contract, not a private contract.  "Parties that benefit from a government contract are generally assumed to be incidental beneficiaries, and may not enforce the contract absent a clear intent to the contrary."  *Id.* at 1211.  *Arista Films, Inc. Emp. Profit Sharing Plan v. Gilford Sec., Inc.*, 51 Cal. Rptr. 2d 35 (Ct. App. 1996), the only California case the defendants cite, concerned an arbitration contract, where the "overwhelming weight of authority" was against third-party enforcement, and which was governed by New York law, not California law. *Id.* at 38.

The other cases on which the defendants rely are all from courts outside California and this circuit.  At this stage in the case—a motion to dismiss—we follow those courts that have ruled that any weight that should be given to an inurement clause is outweighed by the other evidence of the parties' intent.  *E.g.*, *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 430 (S.D.N.Y. 2010); *see also Solid Host, NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092, 1119 (C.D. Cal 2009) ("Because they involve factual questions of intent, third party beneficiary claims are often not appropriate for resolution via motion to dismiss.").

Under California law, as the district judge recognized, a plaintiff may be a third-party beneficiary of a contract if he alleges that he is a member of a class named or referred to in the contract, or if the contract discharges a contractual duty owed to the plaintiff. *Northstar*, 781 F. Supp. 2d at 942–43. We hold, contrary to the district judge, that Northstar has adequately alleged the existence of a contract between the Trust and the investors. Northstar has also alleged that the IAA was designed to discharge the Trust's duties to the shareholders under this contract. Therefore, Northstar's allegations that the shareholders are third-party beneficiaries of the IAA survive the motion to dismiss.[10]

Therefore, we hold that Northstar's allegations that the shareholders are third-party beneficiaries of the IAA survive the motion to dismiss.

## CONCLUSION

To summarize:

1. We hold that by filing a supplemental pleading alleging a post-complaint assignment from a party that clearly had standing, Northstar has standing to prosecute this case.

2. We reverse the district judge's dismissal of Northstar's breach of contract claim and hold that Northstar

---

[10] The district judge found that the Fund investors were "not explicitly mention[ed]" in the IAA. *Northstar*, 807 F. Supp. 2d at 884. This is incorrect: under Section 3 of the IAA, the Schwab Advisor explicitly contracted to "prepare the Trust's Annual and Semi-Annual Reports to Shareholders." We do not, however, rest our conclusion that Northstar has adequately alleged that the shareholders are third-party beneficiaries of the IAA on this one reference.

adequately alleged the formation of a contract between the investors and the Schwab Trust.

3.  We vacate the district judge's dismissal of the fiduciary duty claims and remand for the district judge to "address the other arguments raised by the parties regarding [Northstar's] claims for breach of fiduciary duty[.]" *Northstar*, 807 F. Supp. 2d at 881.

4.  We reverse the district judge's dismissal of Northstar's third-party beneficiary breach of contract claim and hold that Northstar adequately alleged that the investors are third-party beneficiaries of the IAA.

5.  We decline to address the effect of SLUSA on the various common law causes of action.  We leave that to the district court in the first instance.

**REVERSED in part, VACATED in part, and REMANDED.**

---

BEA, Circuit Judge, dissenting:

When Northstar Financial Advisors, Inc. ("Northstar") commenced this action by filing its complaint, it did not own, nor had it ever owned any Schwab Total Bond Market fund ("Fund") shares.  Likewise, at the commencement of this action, Northstar did not own any claims of anyone who had owned any of such shares during the period when the defendants are alleged improperly to have lowered the share value of the Fund.

Hence, when Northstar sued for damages on its own behalf and for those of the class of share owners Northstar sought to represent in this class action, Northstar itself had not suffered any losses, nor did Northstar own any claims of others who had suffered losses the defendants had allegedly caused. Last, no other person who claimed to have been injured by defendants joined Northstar as plaintiff.

Defendants moved to dismiss Northstar's complaint for lack of standing, because Northstar failed to allege it had suffered an injury in fact.[1] Northstar had no "case or controversy" within the meaning of Article III of the Constitution.[2]

The district court quite properly granted defendants' motion and dismissed the complaint without prejudice,[3] but

---

[1] A party seeking to invoke a federal court's jurisdiction must demonstrate three things: (1) an "injury in fact," which is an invasion of a legally protected interest that is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) a causal relationship between the injury and the challenged conduct, such that the injury can be fairly traced to the challenged action of the defendant and not from the independent action of some third party not before the court; and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotations and citations omitted).

[2] *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004) ("A suit brought by a plaintiff without Article III standing is not a 'case or controversy,' and an Article III federal court therefore lacks subject matter jurisdiction over the suit.").

[3] An argument can be made that leave to amend was permissibly granted because it was possible that the lack of allegations constituting standing had been an oversight. However, even that argument is foreclosed in this circuit. "If jurisdiction is lacking at the outset, [a] district court has no

then quite misguidedly suggested that through an amended complaint, Northstar could remedy its lack of standing by an assignment of rights from a person who had been a Fund shareholder during the period when defendants allegedly injured the Fund's shareholders.  More than three months later, Northstar found Henry Holz, a man who had indeed owned Fund shares during the period in question.  Holz could claim injury in fact; he did have standing to sue.  But for reasons best known to himself, he chose neither to sue nor to join Northstar's action.  Northstar procured an assignment of Holz's claims against defendants.

Northstar then filed an amended complaint that alleged Holz's assignment of claims to Northstar.  Defendants again moved to dismiss on the ground that Northstar still had not alleged facts sufficient to establish Northstar's standing to sue, only to have the district court deny the motion upon an original—but nonetheless erroneous—theory.  The district court noted that "in light of [the] previous holding that [an] assignment [of claims] would cure the [Northstar's] lack of standing, and direction to the [Northstar] to file an amended complaint based on the assignment, it would be unfair to [Northstar] to punish them for relying on the [prior district judge's] specific instructions." *Northstar*, 781 F. Supp. 2d at

---

power to do anything with the case except dismiss." *Morongo Band of Mission Indians v. Cal. State Bd. of Equalization*, 858 F.2d 1376, 1380 (9th Cir. 1988) (internal quotations and citations omitted). Therefore, "[i]f jurisdiction was lacking, then [a] court's various orders, including that granting leave to amend the complaint, were nullities." *Id.* at 1381.  This circuit has recognized no exceptions to *Morongo* for the retroactive cure of lack of standing through a supplemental pleading of post-complaint events.

932.[4]  Of course, if this notion of "unfairness" were the law, parties benefitted by erroneous rulings of district courts and who took action in reliance on such erroneous rulings could not be made to give up those benefits.

Thankfully, there is no exception to the requirement of standing based on earlier district court error.[5]  It is not

---

[4] By then the case was reassigned to another district court judge.

[5] "Unfairness" based on reliance on an erroneous earlier district court ruling might be grounds for certain relief, such as tolling of a deadline. *See Smith v. Ratelle*, 323 F.3d 813, 819 (9th Cir. 2003) ("[W]e have recognized that a district court's erroneous dismissal of a mixed habeas petition is sufficiently extraordinary to justify equitable tolling."). But when a judge blows a call on *standing*, the error creates jurisdiction where the law does not, and notions of "fairness" clash with constitutional requirements. The requirement of standing ensures that courts "limit federal jurisdiction to those cases in which an adversarial setting is guaranteed by the parties' 'personal stake' in the outcome of the litigation." *LaDuke v. Nelson*, 762 F.2d 1318, 1322–23 (9th Cir. 1985) (citing *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). Requiring that a plaintiff have an actual injury in fact "tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982). Of course, had Northstar accepted the dismissal without prejudice and then filed a new complaint *after* it obtained an assignment of rights, it would have had standing and a personal stake in the outcome of this litigation. The ease with which Northstar could have obtained standing makes its actions puzzling at first blush. However, had Northstar so refiled, it would also have risked its position as the first to have filed as representative of a class of plaintiffs. Any perceived impracticality of requiring Northstar to adhere to the most basic of our Constitution's standing requirements should not vitiate the need to do so. *See Sprint Commc'ns. Co. L.P, v. APCC Servs.*, 554 U.S. 269, 305 (2008) (Roberts, C.J., dissenting) ("The Court chooses to elevate expediency above the strictures imposed by the

"unfair" to lose a meritless point won earlier before an erring judge. What is "unfair" is not to apply the correct law. Here, both district court judges erred. Because Northstar failed to allege facts sufficient to constitute standing to sue in its complaint, the district court originally lacked subject matter jurisdiction. *See Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004). It was not even permissible to grant leave to amend to see if the standing defect could somehow be remedied. *See* Footnote 3, *supra*. But even if permissible, an amendment to allege an assignment of rights which took place over three months *after* the action was commenced was useless to allege the standing Northstar needed to commence the action in the first place. *Morongo Band of Mission Indians v. Cal. State Bd. of Equalization*, 858 F.2d 1376, 1381 (9th Cir. 1988) (citing *Mollan v. Torrance*, 22 U.S. 537, 539 (1824) (jurisdiction "depends upon the state of things at the time of the action brought"); *Nuclear Eng'g Co. v. Scott*, 660 F.2d 241, 248 (7th Cir. 1981) ("Jurisdictional questions are answered by reference to the time of the filing of an action . . . ."); *Mobil Oil Corp. v. Kelley*, 493 F.2d 784, 786 (5th Cir. 1974) (jurisdiction "is determined at the outset of the suit")). To determine federal court jurisdiction, "we look to the original, rather than to the amended[] complaint." *Id.*

The first district court judge did not have jurisdiction to grant leave to amend, and the second judge could not—out of considerations of "fairness"—allow an amendment or a supplement to an original complaint of which the district court had no subject matter jurisdiction.

---

Constitution. That is a tradeoff the Constitution does not allow. . . . [T]he ease with which [plaintiff] can comply with the requirements of Article III is not a reason to abandon our precedents; it is a reason to adhere to them.").

66    Northstar Fin. Advisors v. Schwab Inv.

The majority and the district court opinion examine the law of other circuits "because there is no published Ninth Circuit authority" as to whether "parties may cure standing deficiencies through supplemental pleadings." *Northstar*, 781 F. Supp. 2d at 933. In dicta,[6] this court reiterated the general principle that "jurisdiction is based on facts that exist at the time of filing" and noted that the "Supreme Court has enunciated few exceptions to this general principle. . . . So far, permitting standing based on a property interest acquired after filing is not one of them." *Righthaven, LLC v. Hoehn*, 716 F.3d 1166, 1171 (9th Cir. 2013).[7] In any event, even if this panel were not bound by the dicta of *Righthaven*, *Morongo* is dispositive: where the district court does not have subject matter jurisdiction over a matter at the time of filing, subsequent events do not confer subject matter jurisdiction on

---

[6] This court is bound by its own reasoned dicta. *United States v. Johnson*, 256 F.3d 895, 914 (9th Cir.2001) (en banc). *Righthaven*'s dicta fits this requirement.

[7] In *Righthaven*, a media company and publisher, Stephens Media LLC, assigned its right to sue for infringement of copyright to Righthaven LLC. 716 F.3d 1166, 1168 (9th Cir. 2013). Righthaven then sued two website operators for displaying content of which Stephens Media was the original copyright owner. *Id*. Defendants filed motions to dismiss for lack of standing, asserting that Righthaven did not have standing to sue because Stephens Media had assigned only a bare right to sue. Under circuit law, assignment of the bare right to sue without the transfer of an associated exclusive right did not confer standing to sue on Righthaven. *Id*. at 1168–69. Before the district court ruled on the motions to dismiss, Righthaven and Stephens Media executed a "clarification and amendment" to the prior assignment that purported to convey all ownership rights to Righthaven. *Id*. at 1169. The district court granted the motions to dismiss. *Id*. On appeal, we affirmed because Righthaven did not have standing to sue at the time of filing, and its subsequent clarification and amendment did not include terms sufficient to convey an exclusive copyright. *Id.* at 1171.

the district court.  The district court has jurisdiction only to dismiss the complaint.**[8]**

Nevertheless, the majority cites to limited exceptions where courts have allowed the cure of jurisdictional defects other than standing through additional pleadings.  In short, the district court and the majority argue that if a supplemental pleading can cure defects in the original complaint, and if that supplemental pleading can be tacked onto the original complaint, then Northstar would retroactively have standing as of its original complaint, even though "subject-matter jurisdiction depends on the state of things at the time of the action brought."  *Rockwell Intern. Corp. v. U.S.*, 549 U.S. 457, 473 (2007) (internal quotations and citation omitted).  This argument misses one crucial point:  "[t]he state of things and the originally alleged state of things are not synonymous."  *Id.*  Therefore, even if our circuit allowed supplemental pleadings to cure standing deficiencies, those supplemental pleadings must allege facts necessary to establish standing only *as those facts existed at the time of the original complaint*.  This is not a novel concept in our circuit.  *See Wilbur v. Locke*, 423 F.3d 1101 (9th Cir. 2005), *abrogated on other grounds by Levin v. Commerce Energy, Inc.*, 560 U.S. 413 (2010) ("[S]tanding is determined as of the date of the filing of the complaint . . . . [t]he party invoking the jurisdiction of the court cannot rely on events that unfolded after the filing of the complaint to establish its standing.") (internal quotations and citation omitted).  In other words, even though "a party [may] serve a supplemental pleading setting out any transaction, occurrence, or event that

---

**[8]** Rather than extend the length of this dissent, I recommend the reader simply read the opinions in *Morongo* and *Righthaven*, should he have any doubt as to their applicability.

happened *after* the date of the pleading to be supplemented," Fed. R. Civ. P. 15(d) (emphasis added), the facts which establish a party's standing must have existed when the original complaint was filed. Thus a Fed. R. Civ. P. 15(d) supplemental pleading cannot validly allege post-complaint transactions to cure a lack of standing.[9,10]

If all an uninjured party need do to get around pesky Article III standing requirements is to file a complaint, then ask for liberal leave to supplement under Fed. R. Civ. P. 15(d) to allege after-acquired rights of those who were timely injured, the long-standing general rule which requires injury-

---

[9] Of course, I do not dispute that plaintiffs may cure various jurisdictional defects—other than standing—through additional pleadings that allege relevant post-complaint events and conditions. The majority cites to several such instances (none of which are decisions from our circuit, and none of which allowed the retroactive cure of lack of allegations of injury-in-fact through a supplemental pleading alleging a post-complaint injury in fact). *See e.g.*, *Newman-Green Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 831–38 (1989) (the Court held that an appellate court may drop a non-diverse defendant—*under Fed. R. Civ. P. 21*—to preserve *diversity jurisdiction* over the claims of a plaintiff who suffered injury-in-fact *before* the original complaint was filed); *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1335–37 (Fed. Cir. 2008) (the Federal Circuit cited its own precedent that allows courts to look at "facts existing at the time the complaint *under consideration* was filed" (internal quotations and citation omitted) (emphasis in original)).

[10] Because I would dismiss for lack of standing, I—like the majority—express no views as to whether the Securities Litigation Uniform Standards Act would preempt Northstar's claim. I also express no views on the claims based on breach of contract, breach of fiduciary obligations, or other claimed grounds of relief. *See Righthaven*, 716 F.3d at 1773.

NORTHSTAR FIN. ADVISORS V. SCHWAB INV.    69

in-fact at commencement of the action for standing to exist quickly would lose all force.  Uninjured parties, particularly those in search of class action lead plaintiff status, could sue first, then trawl for those truly and timely injured.  Today the majority green-lights those who would race to the courthouse and bend Federal Rules of Civil Procedure and Article III standing requirements to gain an edge over other claimants who are not as fleet of foot.  I respectfully dissent.